**Kenneth TAYLOR**

v.

**WARDEN, MARYLAND PENITENTIARY.**

**Civ. No. 18293.**

United States District Court
D. Maryland.

May 29, 1969.

---

Gerald A. Smith, Baltimore, Md., for petitioner.

Francis B. Burch, Atty. Gen., and Alfred J. O'Ferrall, III, Asst. Atty. Gen. of Maryland, for respondent.

## MEMORANDUM AND ORDER

FRANK A. KAUFMAN, District Judge.

Kenneth Taylor, presently confined in the Maryland Penitentiary, seeks habeas corpus relief in this Court alleging (1) that his involuntary confession was erroneously admitted into evidence at his trial, and (2) that he was denied effective assistance of counsel.

On May 29, 1964, at about 11:30 p. m., Taylor was arrested for attempted robbery of a gasoline service station in Baltimore, Maryland. In the course of that incident, Taylor was shot in the hand by the station attendant who forthwith called the police and, pending the arrival of the police, forced Taylor to lie on the ground. The police arrived, took Taylor to a nearby hospital for treatment of his gunshot wound, and then transported him to a police station.

On May 30, 1964, at approximately 9:00 p. m., the police placed Taylor in a lineup. A deliveryman for a drugstore

identified him as the person who had robbed him of $43.00 at about 6:00 p. m. on the night of May 29, 1964. Another deliveryman identified Taylor as the person who attempted to rob him on the night of May 25, 1964.

About midnight on May 30th, Taylor, during interrogation by three police officers, made an oral statement admitting the May 29th attempted armed robbery of the service station, the May 29th armed robbery of the deliveryman, and the May 25th attempted robbery. The statement was typed; Taylor initialled it on one page near a word that had been x'ed out, but refused to sign it. About 2:00 a. m the morning of May 31st, shortly after the interrogation ended, Taylor was taken back to, and received treatment for his hand at, the same hospital at which he had been treated on May 29th.[1]

Taylor was indicted, and on July 21, 1964 was tried for the three crimes in the Criminal Court of Baltimore without a jury. Those trial proceedings commenced as follows:

THE CLERK: Kenneth Taylor, in Indictments 2226, 2227 and 2228, Docket 1964, the State of Maryland charges the crime of robbery with deadly weapon; attempted robbery with deadly weapon in two cases. In [sic] June 1, 1964, you were arraigned and plead not guilty in each case. What is your plea today?

COUNSEL FOR DEFENDANT: If your Honor please, the Defendant has advised me he wishes to plead guilty to each of the charges, and I in turn advised him because of the seriousness of the charge, I didn't think he should plead guilty and because of that, your Honor, I would like to have the plea of nolo contendere—

THE COURT: No, not under those circumstances. You mean he says he wants to plead guilty; because of the seriousness of it you don't think he should?

COUNSEL FOR DEFENDANT: That is right.

THE COURT: And, you want to enter a nolo contendere? I obviously can't accept a nolo.

COUNSEL FOR DEFENDANT: Plea is not guilty to each charge and ask for a court trial.

THE COURT: I don't quarrel with your advising the defendant to plead not guilty, but under those circumstances I don't believe a nolo would be acceptable, although it would be a quicker way of disposing of the case. We will just have to do it the long way. All right.

The State then called to the witness stand the two deliverymen and the station attendant, each of whom testified that Taylor had committed the crime in question.

Two of the police officers who had taken Taylor's statement testified that Taylor had made the statement voluntarily. The prosecutor then read the statement into the record.

Taylor subsequently testified on his behalf. At the commencement of his testimony, the following colloquy took place:

COUNSEL FOR DEFENDANT: Now, I've advised you that, of your rights to testify on your own behalf, have I not?

A Yes, sir.

Q And, I've told you that if you don't testify, no inference of guilt could be drawn from that; is that correct?

A Yes, sir.

Q And, you have expressed the desire to me that you do wish to testify; is that right?

A Yes, sir.

Taylor testified that he had committed all three crimes, but maintained that the gun used in the two May 29th incidents had never been loaded (there is no evi-

1. The hospital records disclose that an ace bandage was removed, Taylor's wound re-

dressed, and bacitracin was applied, at 2:45 a. m. on May 31st.

dence Taylor had or used a gun on May 25th) and that he had been drinking heavily before each of the incidents occurred. Taylor also stated that on May 18th or 19th he had been released on probation after a judge of the Supreme Bench of Baltimore City (not the judge of that Court who tried Taylor in the state court proceeding herein under challenge) had suspended four consecutive eighteen-month sentences for the forgery of checks. Taylor admitted that he had served a six-month sentence in the House of Correction from September, 1963 through February, 1964 for petty larceny. Taylor further testified that his oral statement to the police was true.[2]

Taylor was found guilty on all three charges and sentenced him to consecutive sentences of twenty years, five years and five years for the three crimes. In open Court, prior to Taylor's sentencing, his attorney advised him of his right to file a motion for a new trial and also of his right to prosecute an appeal. However, at no time thereafter did Taylor file a motion for a new trial or note an appeal.

On December 14, 1964, Taylor filed a petition for a writ of habeas corpus in the Criminal Court of Baltimore. On December 23, 1964, he requested that that petition be considered and treated as a petition under the Maryland Uniform Post-Conviction Procedure Act. New counsel was appointed for Taylor, and on June 29, 1965 an evidentiary hearing was held. At that hearing, Taylor testified that, before his statement was taken by the three police officers during the night of May 30th–31st, he had repeatedly requested permission to make a phone call to his mother, but that he was not allowed to contact anyone. Taylor testified that he asked the turnkey as well as his interrogators for such permission.

Taylor also testified that his trial attorney only visited him in jail twice before trial, did not contest the admissibility of his inculpatory statement to the police, helped the prosecution establish the voluntariness of that statement, did not adequately cross-examine the witnesses against him, and in general merely went through the motions of defending him. On cross-examination, Taylor admitted he had never told his trial attorney about the circumstances of his statement to the police, but contended that his trial attorney had at no time asked him about them.

After the taking of the evidence during the post-conviction hearing, the judge who presided at that hearing disqualified himself and withdrew from any further participation in the case because he had been the State's Attorney for Baltimore City at the time of Taylor's trial. Taylor's post-conviction proceeding was resumed before Judge Perrott of the Supreme Bench of Baltimore City on October 27, 1965. Judge Perrott had had no connection with any of the proceedings in that Court involving Taylor which have been referred to *supra* in this opinion. During a hearing on October 27, 1965, it was agreed by the State, Taylor's attorney and by Taylor himself that the testimony taken at the post-conviction hearing should be considered by Judge Perrott without the need for the retaking of same or the taking of any additional evidence.

Judge Perrott, after consideration of further argument by counsel and on the

2. It has been suggested that in order to pursue collateral federal relief a petitioner should be required to assert his innocence or make a preliminary showing that such an allegation has some substance. *See* Kaufman v. United States, 394 U.S. 217, 89 S.Ct. 1068, 22 L.Ed.2d 227, 240 (March 24, 1969) (dissenting opinion of Mr. Justice Black taking that position); *compare id.* 394 U.S. 217, 89 S.Ct. 1068, 22 L.Ed.2d at 246 (dissenting opinion of Mr. Justice Harlan). The view expressed by Mr. Justice Black was seemingly rejected by implication in the majority (5–3) opinion in *Kaufman* written by Mr. Justice Brennan. Mr. Justice Harlan, joined by Mr. Justice Stewart, while dissenting from the majority opinion, specifically stated disagreement with the above-referred to position of Mr. Justice Black.

basis of the testimony taken at the post-conviction hearing, denied the relief sought by Taylor in a Memorandum Opinion dated August 4, 1966. Taylor's application for leave to appeal was denied in a per curiam order dated March 31, 1967 by the Court of Special Appeals of Maryland.

On April 21, 1967, Taylor filed the within petition for a writ of habeas corpus. This Court signed a Show Cause Order on May 1, 1967, and on May 23, 1967 the State filed a motion to dismiss Taylor's petition, attaching as exhibits transcripts of the post-conviction hearings, Judge Perrott's opinion, and the per curiam order of the Court of Special Appeals. On June 26, 1967, this Court appointed the same attorney who had represented Taylor in the state court post-conviction proceedings, namely, John B. Hargrove, Esq., now Judge of the Municipal Court of Baltimore City, to represent Taylor in the proceedings in this Court. After Judge Hargrove was appointed to the Bench, this Court appointed in his place, Gerald A. Smith, Esq., a former partner of Judge Hargrove. On July 16, 1968, Mr. Smith filed a memorandum in support of Taylor's petition for writ of habeas corpus and in opposition to the State's motion to dismiss. A nonevidentiary hearing was calendared for December 12, 1968 in this Court. Due to a misunderstanding about the nature of that hearing, several subpoenas were issued, but no evidence was taken and a nonevidentiary hearing was held as scheduled. Thereafter, as requested by this Court, the State filed herein a complete transcript of the trial. On February 19, 1969, an evidentiary hearing was held in this Court.

Taylor, Taylor's trial counsel, and Sgt. McLaughlin of the Baltimore City Police Department, one of the policemen who had interrogated Taylor during the middle of the night of May 30–31, 1964, testified on February 19, 1969 in this Court. After consideration and review of the above-referred to proceedings in the state court and in this Court, this Court hereby denies Taylor the relief he seeks in this case.

I.

Taylor's trial took place on July 21, 1964, one month after the Supreme Court's decision in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), but before that Court's opinions in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). In Frazier v. Cupp, Warden, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (decided April 22, 1969), Mr. Justice Marshall wrote:

Since petitioner was tried after this Court's decision in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), but before the decision in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966), only the rule of the former case is directly applicable. Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). Petitioner argues that his statement about getting a lawyer was sufficient to bring Escobedo into play and that the police should immediately have stopped the questioning and obtained counsel for him. We might agree were Miranda applicable to this case, for in Miranda this Court held that "[i]f * * * [a suspect] indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." 384 U.S. at 444–445, 86 S.Ct. 1602 at 1612. But Miranda does not apply to this case. This Court in Johnson v. New Jersey pointedly rejected the contention that the specific commands of Miranda should apply to all post-Escobedo cases. The Court recognized "[t]he disagreements among other courts concerning the implications of Escobedo," Johnson v. New Jersey, supra, 384 U.S., at 734–735, 86 S.Ct. 1772, at 1781, and concluded that the States, although free to apply Miranda

to post-*Escobedo* cases, *id.*, at 733, 86 S.Ct. 1772, were not required to do so. The Oregon Supreme Court, in affirming petitioner's conviction, concluded that the confession was properly introduced into evidence. Under *Johnson*, we would be free to disagree with this conclusion only if we felt compelled to do so by the specific holding of *Escobedo*.

We do not believe that *Escobedo* covers this case. Petitioner's statement about seeing an attorney was neither as clear nor as unambiguous as the request Escobedo made. The police in *Escobedo* were unmistakably informed of their suspect's wishes; in fact Escobedo's attorney was present and repeatedly requested permission to see his client. Here, on the other hand, it is possible that the questioning officer took petitioner's remark ["I think I had better get a lawyer before I talk any more."] not as a request that the interrogation cease but merely as a passing comment. Petitioner did not pursue the matter, but continued answering questions. In this context, we cannot find the denial of the right to counsel which was found so crucial in *Escobedo*. [Frazier v. Warden, *supra*, 394 U.S. at 738, 89 S.Ct. at 1424.]

Taylor testified in this Court that he expressed his desire to his police interrogators that he be permitted to consult a lawyer before being questioned. However, Taylor made no mention of such a request at his trial or during his post-conviction proceedings. Sgt. McLaughlin testified in this Court that Taylor had not made any such request. Previously, during Taylor's trial, McLaughlin testified that Taylor had not asked him to permit Taylor to see a lawyer, but that Taylor had said that he would not sign the statement until he talked with his lawyer. At the hearing in this Court, Taylor testified that he was interrogated twice during the day of May 30th and once about midnight. He said that there were several officers present at each of the interrogations, but that only the officer in charge was at all three interrogations. In this Court, Taylor said that, at the time of the third and final interrogation, "I don't actually remember at that particular time making a formal request for an attorney or lawyer, but I do remember telling them that if I didn't get to a hospital that my lawyer would hear about it eventually."

■■■ This Court, having heard and observed Taylor and Sgt. McLaughlin in the proceedings in this Court, finds the testimony of the latter credible and the testimony of the former lacking in credibility. There is no credible evidence that Taylor requested counsel before his interrogation. *Escobedo* is therefore not offended by the interrogation in this case. Frazier v. Cupp, Warden, *supra*. Nor was there any failure under the standards of voluntariness set forth in Greenwald v. Wisconsin, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968); Clewis v. Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); and Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966). Among the relevant factors to be considered in determining voluntariness of a statement such as the one Taylor made are: the education, intelligence and experience of the defendant, the length of time he was held in custody, the warnings or lack of same given to the defendant, the defendant's physical treatment during his period of confinement and interrogation, and the presence or lack of promises, threats or inducements made to the defendant by his interrogators.

Taylor was not inexperienced in the ways of the law in 1964. Although there is no indication in the record of the length of his formal education, he was twenty-three years old when he was arrested in 1964. Prior thereto he had previously been convicted of petty larceny in Baltimore County in September, 1963, and in four cases of forgery earlier in May, 1964. Taylor revealed himself at the hearing in this Court on February 19, 1969 as intelligent and well-spoken.

Taylor had been in custody approximately twenty-four hours before he made his statement. He testified that before the interrogation at which he made the statement, he had been interrogated twice, once about 9:00 a. m. on Sunday morning, May 30th, for about thirty-five minutes, and once that Sunday evening after the lineup. The third and final interrogation began about midnight.[3] Taylor testified in this Court that he had complained earlier during the evening of May 30th to the turnkey that his hand was hurting, that he had at the same time requested to see a doctor, and that shortly thereafter, he was taken to the interrogation room and questioned by three officers, one of whom, the officer in charge, had previously interrogated him and had heard his previous request to see a lawyer.

Sgt. McLaughlin testified that he was in charge of the interrogation and that he did not come on duty until about midnight. He explained that he had not interrogated Taylor previously because of the shift schedule, the necessity to assemble evidence, reports, and the results of the lineup, and the fact that Taylor probably had been given medication at the hospital.

Taylor was arrested on a Saturday night. He was taken before a judge in the Municipal Court Monday afternoon. The original post-conviction judge observed that there is no session on Sunday afternoon. On Monday, the judge before whom Taylor appeared informed Taylor he would appoint counsel for him. Counsel was so appointed and visited Taylor within "a couple of days."

 During the taking of Taylor's statement, the following warning was given by Sgt. McLaughlin:

But before you say anything, I want you to know that what you tell us must be of your own free will and that I'm not going to make you any

promises nor am I going to grant you any favors or inducements, and that anything you say now may be used for or against you in court.

It is not entirely clear when Sgt. McLaughlin gave those warnings. In Davis v. North Carolina, *supra* at 740, 86 S.Ct. at 1764, the Supreme Court stated:

[[T]he fact] that a defendant was not advised of his right to remain silent or of his right respecting counsel at the outset of interrogation, as is now required by *Miranda,* is a significant factor in considering the voluntariness of statements later made.

But failure to advise a defendant (a) before he is interrogated and (b) of his right to counsel, as is required since *Miranda,* does not in and of itself render a pre-*Miranda* confession "involuntary" if there are compelling indications, as there are in this case, of voluntariness.

Taylor has made no complaint that he was treated badly by his interrogators or at any time during his confinement except for his contention that he requested, and did not receive, prompt medical treatment for his hand. That contention is part of his claim that his confession was coerced by the threat of withholding medical treatment. In this connection, Taylor testified at his post-conviction hearing that about midnight Sunday night his hand was swollen and was causing considerable pain and that he asked the turnkey to see a doctor. Then, Taylor testified, two police officers who had previously questioned him and a new sergeant arrived and took him to the interrogation room; that the sergeant told him that if he didn't cooperate, he would not get to see a doctor; that he had to give a statement in order to get some treatment; that he refused to sign the statement but put his initials on it in order to get medical treatment; and that immediately after he

---

3. This chronology is slightly different from the one related by Taylor at the post-conviction hearing. There, his testimony was somewhat confused. In any event, it is clear that Taylor's confession was given within a bit more than 24 hours of his arrest.

made the statement he was taken to the hospital for treatment.

In this Court, Taylor testified that about midnight he told the turnkey his hand was hurting terribly and asked to see a doctor as soon as possible; that soon afterwards, a sergeant came and asked him what was wrong and that he responded that he was afraid of blood poisoning in his hand; that about five minutes later two other officers took him to the interrogation room; that he then told all three interrogators of the condition of his hand, requested treatment, and was told if he didn't cooperate, he would receive no hospital treatment; and that one officer told him "he could really care less if I got blood poisoning or not."

Sgt. McLaughlin testified in this Court that he interrogated Taylor about midnight; May 31st; that he did not recall any complaints by Taylor about his hand prior to or during the interrogation; that during the interrogation Taylor did not request to make a phone call to anyone; that he had not spoken to Taylor between the visit to the hospital Saturday night and the interrogation Sunday night; and that neither he nor anyone else in his presence told Taylor that Taylor would not get treatment for his hand until Taylor gave a statement. At Taylor's trial, both Sgt. McLaughlin and Officer Mitchell testified that they made no promise to Taylor, that they did not offer him any reward, and that Taylor's statement was given without any pressure.

This Court accepts as truthful the testimony of Sgt. McLaughlin. Taylor testified in the post-conviction hearing that he never informed his trial lawyer of the threats made by his interrogators. In this Court, he stated, in effect, that the reason for such nondisclosure was that he did not understand the relevance or importance of such police action or statements. Yet Taylor also testified in this Court that he remembered telling his interrogators: "If I didn't get to a hospital that my lawyer would hear about it eventually." It is

incredible that Taylor made such a statement during his interrogation and then failed to relate it, or the police conduct he later complained of, to his trial attorney. The facts of this case clearly sustain Judge Perrott's holding that Taylor's statement was given voluntarily. This Court accepts that holding and in addition independently reaches the same conclusion on the basis of its consideration of the records in the trial and post-conviction proceedings and on the basis of the evidentiary hearing in this Court.

II.

There remains for consideration Taylor's contention that he was denied his Sixth Amendment right to counsel because his trial lawyer was incompetent, uninterested and ineffectual. Taylor cites the failure of his trial attorney to appeal and the manner in which his counsel dealt at trial with the issue of the voluntariness of his statement, as evidence of his counsel's lack of competence. Taylor's counsel in this Court contended, in a memorandum filed herein, that the colloquy between the trial judge and trial counsel (quoted *supra*) is not only evidence of Taylor's trial counsel's incompetence, but also *per se* reveals that Taylor's entire trial was bottomed on an inherently prejudicial beginning.

Taylor's trial counsel, who testified at the February 19, 1969 hearing in this Court and also at Taylor's state court post-conviction hearing, is an experienced trial lawyer who has spent the last twenty years of his thirty-five years of practice specializing in criminal law. He testified in this Court that before trial he visited Taylor twice in jail and once again in the lockup; that he talked to Taylor about the statement Taylor had given to the police; and that Taylor never mentioned to him any threats by the police to withhold medical care. Taylor admitted in the post-conviction hearing that he never told his trial counsel that he had attempted, and had not been permitted, to make a phone call. Tay-

lor's trial counsel testified in the post-conviction proceeding that he did discuss Taylor's alcoholic problem and its possible use as a defense, and that in that connection he himself had subpoenaed the hospital records.

Prior to trial, Taylor's attorney was faced with the following situation: Taylor had been arrested red-handed at the scene of an attempted holdup. Taylor had been identified in a lineup by the victims of two other crimes. The victim of one of them, i. e., the armed robbery, had known Taylor previously so there was little chance of mistaken identity. Taylor had been drinking the night he was caught. Taylor considered himself an excessive drinker and desired to be sent to an institution for treatment. Taylor was to be tried before a judge whom Taylor's trial counsel described in testimony before this Court as "firmly, firmly, adamantly opposed to armed holdups. He would give the maximum." Taylor's trial attorney also testified in this Court that Taylor "insisted" on pleading guilty. On the other hand, Taylor testified in this Court that he at no time indicated to his trial counsel that he wanted to plead guilty. This Court believes, and so finds, that Taylor's trial counsel was told by Taylor that Taylor wanted to plead guilty. The colloquy, quoted *supra*, which took place at the commencement of Taylor's trial and a reading of the various records in this case buttress that finding beyond doubt.

The question still arises as to why Taylor's trial counsel handled the case as he did. When questioned by the post-conviction judge concerning why he informed the trial court that his client wished to plead guilty after he had advised Taylor to plead not guilty, Taylor's trial attorney replied:

A If your Honor please, the defendants on occasion in conversation with their counsel will admit their guilt. There have been rulings in the Federal Courts that irrespective of the client's guilt it is the paramount duty of his counsel to use every effort to find him not guilty. I therefore advised my client, irrespective who they are, irrespective what the charges are, under all circumstances to plead not guilty and take advantage of anything that might accrue to them.

THE COURT: Why would you tell [the trial] Judge * * * that he wanted to plead guilty?

A Because he had told me so. I certainly wouldn't take that out of a figment of my imagination.

THE COURT: He told you that he wanted to plead guilty?

A He told me that he wanted to plead guilty and I insisted that he plead not guilty.

THE COURT: Why would you tell [the trial] Judge * * * who was going to try the case on a not guilty plea that the man wanted to plead not guilty?

A Because the facts were so strong in my judgment against him that I felt it was my duty to tell the Court that he had wanted to make a plea of guilty but in my judgment he should not do so.

THE COURT: And you made this at the same time you entered a not guilty plea for him?

A If I did it would have to be after the plea, your Honor.

THE COURT: Would this be an actual inconsistency in a plea to tell the judge he is pleading not guilty but he wants to plead guilty?

A No, that wouldn't be any inconsistency whatsoever. The State still has to make out a case no matter how he wanted to plead. I might get a motion for a directed verdict of acquittal or some technicality irrespective of his guilt.

THE COURT: Might not this tend to prejudice his case before the judge?

A Not at all.

THE COURT: On a not guilty plea?

A Not at all.

When asked in this Court to explain why he told the Court that Taylor wished

to plead guilty and then proceeded on a not guilty plea basis, Taylor's trial attorney answered:

A I think Mr. Taylor put it in better language than I possibly could when he testified here a moment ago. He said that I was trying to get the sympathy of the Court, which I was.

In other words, Mr. Taylor had insisted that he wanted to plead guilty, and I told him that I thought it was contrary to his best interests to do so.

Now, I told the Court that he wished to plead guilty because I didn't want to be put in a position that Mr. Taylor could later come in and say, well, I wanted to plead guilty but my lawyer wouldn't let me. At the same time, I am also duty-bound to protect Mr. Taylor in respect to the fact that if he plead not guilty, the State still has to make out a case against him. Some technicality might have arisen; witnesses might have died from the time we started the trial; anything could possibly happen, and he would get the benefit of that.

I also asked the Court for permission to enter a plea of nolo contendere. Now, certainly a plea of nolo contendere is an admission of guilt; it's the same interference, if you want to draw it that way.

In any case, to offer a plea of nolo contendere and the Court will say, well, I won't accept it at this time; I'll take a formal plea of not guilty and determine later whether I will accept the plea of nolo contendere, is the same thing that I was doing, in language that Mr. Taylor could understand.

THE COURT: Did you explain what nolo contendere meant to Mr. Taylor?

THE WITNESS: This is four years later, Your Honor. I couldn't truthfully say whether I did or not.

THE COURT: Can you tell us what your practice was or was not?

THE WITNESS: If I were to offer a plea of nolo contendere, I would have explained it to Mr. Taylor, and if I used the language "nolo contendere," I'm sure that—or I am sure that I did explain it to him, but to say positively four years later, I couldn't do that.

BY * * * [ASSISTANT ATTORNEY GENERAL FOR THE STATE OF MARYLAND]

Q * * * [W]hen you tender a nolo contendere plea to the Court or inform the Court, which you did in this case and also what you did in this case, inform the Court of the petitioner's wish to plead guilty and the Court insists that you go on the not guilty and then refuses to accept the nolo contendere plea, do you not think that it would be a good practice to request another Judge to rehear the facts?

A No. No, and I'll explain to you why. There are some Judges that if you enter a plea of guilty will take that into consideration and perhaps modify the eventual or the ultimate sentence that the defendant will get.

In this particular case, I wanted the Judge to know that the defendant had told me that he wanted to plead guilty, and at the same time I wanted him to get the benefit of any possible sentence that the Court might give him— there were three cases of robbery involved, as I recall—and then if I had plead not guilty, as I wanted to, without telling the Court of the defendant's wishes, I would have placed him in a situation that perhaps he couldn't get a break on the sentence.

And that's exactly why I said what I did, and that's exactly why Mr. Taylor said that I was trying to get the sympathy of the Court.

Now, I would like to add one more thing, that I at no time hid anything from Mr. Taylor. He was fully acquainted of what I had intended to do because I had told him so. I would not have done this on my own because I would not have been that stupid.

The fact that a trial judge learns of a defendant's desire to plead guilty does not *per se* render that judge constitutionally incapable of conducting a fair non-jury trial. McCall v. Garrity, Mem.Opinion No. 12957 (4th Cir., April 28, 1969). Petitioner, however, contends that White v. Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963), and Walker v. Brough, 368 F.2d 349 (4th Cir. 1966), require this Court to grant relief in this case. This Court, after consideration and comparison of those cases and the within case, rejects that contention.

In White v. Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963), White was arraigned without counsel before a magistrate at a preliminary hearing and pleaded guilty in a capital case. At a second arraignment, White, then represented by counsel, pleaded "not guilty" and also "not guilty by reason of insanity." The fact that White had pleaded guilty at his original arraignment was introduced without objection into evidence at White's trial in a Maryland state court in which he was convicted and sentenced to death. The Supreme Court, in a unanimous per curiam opinion, held that, in that case, the preliminary hearing was "critical" and stated (at 60, 83 S.Ct. at 1051):

> We repeat what we said in Hamilton v. Alabama, *supra*; 368 U.S. [52] at 55, 82 S.Ct. at 159 [7 L.Ed.2d 114] [1961] that we do not stop to determine whether prejudice resulted: "Only the presence of counsel could have enabled this accused to know all the defenses available to him and to plead intelligently." * * *

In the within case, the record does not indicate that Taylor at any time entered a plea without the assistance of counsel.

In Walker v. Brough, *supra*, the defendant was indicted and convicted of first degree murder by a Baltimore City trial judge sitting without a jury. When he was originally arraigned, he twice stated that he was pleading guilty. The presiding judge immediately remarked (368 F.2d *supra* at 350):

> Strike it out and enter a plea of not guilty.
>
> Do you have any counsel?

After satisfying himself that Walker was without counsel and that neither he nor his family had funds to retain one, the Court stated: "I suppose counsel ought to be appointed"; and asked an attorney who was present in the courtroom if he wanted a client. That attorney, after being informed by the judge that Walker "pleaded guilty to a murder charge and struck it out and entered a plea of not guilty," replied: "Sounds like he needs a priest not a lawyer." He then agreed to handle the case. Subsequently,

> For reasons not appearing of record, and admittedly immaterial, another attorney was substituted for the one first appointed. The second attorney, who represented Walker at trial, had not been present at the arraignment and was not informed by the court, the clerk, the accused or anyone of Walker's two pleas of guilty. Nor did the docket show that such pleas had been entered and later stricken. In short, this attorney had no knowledge with respect to what had occurred at the arraignment.
>
> Some months later the case came on for trial before the same judge who had presided at the arraignment, a jury having been waived. The principal defense was insanity, and, as stated by the District Court, there was a "real issue whether Walker was guilty of first or second degree murder." Walker was convicted of first degree murder and was sentenced to life imprisonment. No appeal was taken. [368 F.2d *supra* at 351.]

Chief Judge Thomsen of this Court granted Walker's petition for habeas corpus relief. Affirming, Judge Boreman wrote for a divided court:

> It is clear that a change of venue under the Maryland Constitution and statute is readily procurable in Maryland in capital cases. * * * [Foot-

note omitted.] [368 F.2d *supra* at 352.]

\* \* \* \* \* \*

Indeed, it is true, as suggested by the appellant Warden, that we can only speculate as to what course of action Walker's trial counsel would have pursued had he known that his client had twice tendered a plea of guilty to a charge of having committed an offense punishable by death before the judge who was to determine the guilt or innocence of his client. But it is inconceivable that a competent defender, with full information of what had transpired, would not immediately sense the *possibility of prejudice* if the arraigning judge should try the case. He would act to eliminate any such possibility. We quickly conclude that the best interests of the accused would prompt counsel to first obtain removal of the trial to another court. Upon removal, if it appeared likely that the same judge would follow to try the case, the next logical move would be to seek the possible assignment of another judge or exercise the accused's absolute right to a jury trial. [Emphasis in original.] [368 F.2d *supra* at 352.]

After reviewing, and quoting from, White v. Maryland, *supra,* Judge Boreman concluded:

In undertaking the representation of Walker his appointed counsel was operating in the dark, through no fault of his own, completely disadvantaged by his lack of vitally important information. He was not in position to provide the effective representation and assistance to which Walker was entitled. Under these circumstances we conclude that we should not "stop to determine whether prejudice resulted." [368 F.2d *supra* at 353.]

In Martin v. Copinger, Mem. Opinion No. 12,264 (4th Cir., March 6, 1968), Martin was arraigned at a preliminary hearing without counsel and pleaded guilty to four charges of robbery with a deadly weapon. Subsequently, he changed his plea to not guilty and was later tried by the same Maryland State Court judge sitting without a jury, found guilty, and sentenced to forty years of confinement. In this Court, in denying federal habeas corpus relief, Judge Northrop noted that while the decision in *White* was "difficult to distinguish" because the same state court trial judge presided at both the arraignment and trial of Martin, the latter had not been prejudiced in view of the positive identification of four eyewitnesses, the voluntary inculpatory statements of the defendant himself, and the lack of any defense testimony.

Affirming, per curiam, Judges Haynsworth, Sobeloff and Boreman wrote (at n. 1):

In addition to the factors mentioned in the district court's opinion, we note that the transcript of the arraignment reveals that the state judge was acutely aware of the need for counsel. Immediately upon the entry of the plea, Judge Carter ordered it stricken and appointed counsel. In addition, both Martin and his trial counsel testified at the post-conviction hearing that Martin had no defense to the charges, and that he had wanted to plead guilty even after counsel was appointed for him. His attorney testified that the only reason he had persuaded Martin to change his plea to not guilty was because some of the charges might have to be dropped because of the absence of witnesses if the case were carried to trial. This, in fact, occurred, and two of the charges were ultimately dropped for that reason. There was no indication anywhere in the record that the earlier plea of guilty was in any way considered at the trial, whereas in *White* the guilty plea had been expressly called to the attention of the trier of fact. Although it would have been preferable for a different judge to have presided over the trial, and in some cases the presence of the same judge at trial who had originally heard a defendant enter a guilty plea might serve to bring a case within the *White* rule, we do not think that, un-

der the particular facts of this case, the events at Martin's arraignment were such as would be likely to result in prejudice to him at trial.

The facts and issues in the within case are quite different from those in *White* and in *Walker*. In this case, Taylor "insisted" upon pleading guilty after assistance of counsel and contrary to his attorney's advice. In *Walker*, counsel knew nothing of the previous plea and therefore was unable to counsel Walker about change of venue and a jury trial. In this case, Taylor's counsel formulated the strategy.

In *Martin*, the trial judge was informed of Martin's desire to plead guilty at an arraignment. In this case, the trial judge learned of Taylor's desire at the outset of the trial, as did, presumably, the witnesses. Thus, in this case, the trial judge was obviously aware of defendant's desire to plead guilty, while in Martin's situation, the desire to plead guilty was not as fresh in the trial judge's mind.

In this case, however, as opposed to the factual situations in *White, Walker* and *Martin*, the trial judge was informed of the defendant's desire to plead guilty with the concurrence of counsel. Further, Taylor desired to plead guilty even after conferring with counsel, while Walker, White and Martin all gave their respective indications of wanting to plead guilty without assistance of counsel. On the other hand, in the within case, there was clearly an unfortunate remark made by the trial judge at the end of his colloquy with counsel at the commencement of the trial. No such remark appears to have been made in the other cases discussed *supra*. But despite the remark in this case, the record discloses no prejudice by the judge in the conduct of the trial and gives no indication that any prejudice to Taylor resulted from the fact that the judge, who tried the case without a jury and found Taylor to be guilty on all three of the charges against him, learned of Taylor's desire to plead guilty at the beginning of the trial, during the aforesaid interchange by the

Court with counsel. The three cases against Taylor were each very strong. Taylor admitted his guilt at trial and voluntarily confessed to the same before trial. Trial counsel and the defendant have both testified that there were discussions about drinking as a mitigating circumstance. The main thrust of the defense was to obtain a lesser sentence. In that connection, the defense continually emphasized that the gun used was not loaded and that the defendant was a problem drinker.

 Taylor attacks in this Court the handling of his case at trial by his original counsel. But, clearly, the conduct of the defense in this case cannot be said to have been so ineffective as to constitute a denial of Taylor's right to counsel under the Sixth and Fourteenth Amendments. The right to counsel does not guarantee every defendant a perfect trial or a perfect defense. In this case, trial counsel adopted a strategy of attempting to obtain a lesser sentence and still preserve all of defendant's rights. He did advise defendant of his right to move for a new trial, his right to appeal, and his right not to testify at his own trial. Whether or not the defense was artistic is not a question for this Court.

This is not a case like Jones v. Cunningham, 313 F.2d 347 (4th Cir. 1963), in which the trial attorney did absolutely nothing to assist his client, made no investigation of the facts, contacted his client only on the day of the trial, and made no objection to or appeal from a sentence which was illegal on its face.

In contrast, Taylor's trial counsel visited him at least twice before trial and made preparation for trial including summoning hospital records. Faced with a strong case against his client, trial counsel, resisting his own client's strong desire to plead guilty, embarked upon a course designed to minimize the sentence. His tactics, i. e., the lack of extensive cross-examination of witnesses, the apparent cooperation of defense counsel with the State in establishing the voluntariness of Taylor's statement and

Taylor's testimony at trial that he did commit the crimes, are all consistent with trial counsel's goal, i. e., to obtain a more lenient sentence.

If Taylor's trial attorney had permitted Taylor to plead guilty there would now be no question of ineffective assistance of counsel. Guilty pleas are often tendered when the State's case against a defendant seems overwhelming. In this case, however, counsel tried to do more than plead guilty; he attempted to obtain the benefits of a guilty plea without what he considered to be its detrimental legal effects. His efforts clearly cannot be characterized as constituting a deprivation of Taylor's constitutional rights to adequate representation by counsel. *See* Horne v. Peyton, 356 F.2d 631, 633 (4th Cir. 1966); Snead v. Smythe, 273 F.2d 838 (4th Cir. 1959).

For the reasons set forth in this opinion, Taylor's petition is denied. The Clerk of the Court is directed to mail a copy of this opinion to the petitioner, to his counsel, and to the Attorney General of Maryland.*

* On September 12, 1969, in Memorandum Decision, No. 13,603, the Fourth Circuit affirmed the Order of this Court denying habeas corpus relief to Taylor.